Case No. 22-10721, Secretary of Labor, Mine Safety, and Ops Administration, KC, v. KC Transport, Inc., and Federal Mine Safety and Ops Review Commission. Ms. Maltz for the KC Center, and some of you for the respondents. Good morning. Good morning, Governor. Ms. Maltz, we'll hear from you. Thank you. You have me confused because you're sitting where the respondents usually sit. Oh, I apologize. But that's what you normally are. Yes, yes, of course. At any rate, good morning. Good morning. May it please the Court, I'm Susanna Maltz, the Petitioner, Secretary of Labor. I'd like to reserve two minutes for rebuttal, please. Can you please move the microphone a little closer? Sure. Thank you. How's that? That's great. Very good. This case is simple. The Mine Act gives EMSHA enforcement authority over mines. Section 3H1C of the Act defines mines as including equipment and facilities used in mining. The subsection is clear that equipment and facilities used in mining are mines due to their function, their use in mining, and it does not require them to be located anywhere in particular to be considered mines under the Act. A reading of this Court's decisions in Donovan v. Carolina Stalite and Secretary of Labor v. National Cement Company of California conveys this as well. In Carolina Stalite, this Court determined that the Act does not require subsection C facilities to be located on property where extraction occurs. And in National Cement, this Court determined that subsection C reaches vehicles used in mining but not located on a subsection A extraction area. But how do we deal with the fact that in, I think it's Section 103, or how do we deal with the fact that inspections are required to occur, I guess, twice a year according to 813A of each surface coal or other mine in its entirety? EMSHA is required to inspect surface coal mines two times a year, and to the extent that these equipment and facilities, et cetera, are considered mines under the Act, EMSHA will inspect them. That's EMSHA's role. KC Transport has suggested that this will explode, this burden will weigh on the agency, but it's not a burden for EMSHA to enforce the Mine Act. What I guess I'm getting at is in order to inspect something, you have to know where to find it, and especially if it's a mandatory requirement that an inspection occur a certain number of times per year. And so it seems that in that sense it would kind of be congruent with Congress's intent that there be some sort of location aspect to Part C of 803. I disagree that Congress... I'm sorry, 802H3. Yes. Congress didn't require a locational element, although I do understand the congressional requirement that mines be inspected. These circumstances play out the way that they did here. An inspector was present at an extraction site and traveled to KC Transport's maintenance facility and observed violations of the Mine Act standards. This is how Subsection C applies. This is how EMSHA inspectors would and will and do enforce the Mine Act where equipment and facilities aren't located on the extraction site. I guess what I'm saying is that I don't know that you necessarily lose because there's a location aspect to this Part Subsection C, but, you know, sit and poker. I'm just going to tell you what I'm thinking right now, and you tell me your reaction to it. So it appears from our decisions in, I think, Donovan and National Cement that one way that you could look at this is that in H1, A has been interpreted to mean the land and everything that's on the land. B, the private ways and roads pertinent to such area. We expressed some concern that if that meant private ways and roads pertinent and everything on that area, that that could be too broad because roads could be used for non-mining activities. And so as a result, the Secretary, we sent it back, and the Secretary said, well, the road itself, as long as it's kind of principally used for mining activity, can fall within the definition of a mine. And to the extent that there is equipment on the road that's used for mining activity, like a truck, then that is also a mine. The Commission seemed to say that geographically a mine can't go beyond either of those two places, places defined in A or B, in that C cannot geographically expand the jurisdiction of the Mine Act, and mines can't be beyond any place that would fit within A and B. To me, that seems wrong because it goes against, you know, basically C wouldn't do much work at all if that were correct. But that doesn't mean that any truck found anywhere that is coming from a mine or on its way to a mine is a mine. The equipment, machines, tools, or other property that's being referred to in C has to be located on or a part of the rest of the things that are in that subsection C, What's wrong with that interpretation? Well, let me see whether this answers the question. I agree that the Commission's decision is wrong. Subsection C items need not be located on a subsection A mine or a subsection B road in order for the Mine Act to reach them. So whether or not a truck is coming or going from a mine wouldn't necessarily, you know, the Act wouldn't necessarily cover that truck. The analysis of whether or not that truck is used in mining, that seems rather broad, but that is what the statute says. Have I, is that, I may have not answered the entire question. Well, I guess all I'm saying is that this is a somewhat oddly written statute, and one thing I haven't been able to chase down yet is that I noticed that the legislative history says that this language from subsection C may have been taken from the Federal Metal and Non-Metallic Mine Safety Act because the Senate report says that the definition of mine was enlarged to include the mines that were previously covered by that act. And so it appears to me that that language from subsection C may have come at least in whole or in part from that prior statute. Do you know anything about that? Yes, the Mine Act, the Coal Act originally applied only to coal mines. The Mine Act expanded the coverage of that statute to reach coal mines and other mines. So the language in subsection C, you know, there's, I don't want to say analogous language, but there's some language that is similar to subsection C in the Coal Act, and there's some language that's similar to subsection C in other acts that previously regulated other mines in the industry. To the extent that your question is sort of getting at did Congress intentionally leave a locational element out of subsection C, yes. Did Congress, you know, give extra jurisdiction over all these items, you know, including items that were relevant in these other statutes? Did Congress give extra jurisdiction over those and not require them to be located on lands in A or roads in B? Yes. Can I ask, I think this might go to Judge Wilkins' question. I think we said in National Cement 2 that subsection C reaches vehicles used in mining but not located within an extraction area. And I think the question is are there any limits to this? The hypothetical of a mining truck parked in a diner parking lot, things of that nature. Is it your position that subsection C would apply to such a truck parked in a diner parking lot or a tool in a miner's house? The answer is no. Well, the answer is it depends. The subsection C reaches, I apologize, I see I'm over time. I'll just quickly answer your question. You can continue. Thank you. The act, so whether or not something is used in mining is a factual analysis. If something were, after an analysis of the facts, determined to be used in mining, MSHA, the act, the statute does apply to that. Is there a temporal limit on that? Is there a temporal limit on that? What if it was used in mining 30 years ago? I'm sorry. Yes, I think that type of fact would go into the analysis as to whether or not it's used in mining and it would be considered amongst those other facts. Something doesn't remain used in mining for years and years, I think, if that's what the question is getting at. There's not a permanence to use in mining. So your position would be that the truck used to transport coal that's parked in a diner parking lot could be inspected in the diner parking lot? MSHA would not inspect a truck in a diner parking lot. But it could be. But the statute, if the truck is used in mining, the statute would cover it. On Judge Pan's question about a time limit, the statute says, quote, to be used in extracting, milling, etc. So if the truck had not been used for 30 years and was going, quote, to be used in five years, is the truck a mine? I think that I would need additional facts, but... It could be a mine? If the truck is to be used in, based on the universe of facts about the truck, then yes, the statute covers it. It's a broad reading? Sorry? It's a broad reading of the statute? Yes, and Congress intended the reading to be broad. Congress, in fact, intended the reading to be as broad as possible. So I think I know the answer to this hypothetical based on your answer to the last one. It's a hypothetical I've had in my head. It's probably more realistic than my hypothetical I just gave you where the truck is going to be used, but it's only going to be five years. Okay, so I drive a truck. The truck has no commercial purpose other than to be used for mining. And I drove it on Monday at the mine, and it's the holiday season, so I drive it across the country to visit my family in California. I drive it from, where was this mine? In this case, I forget. I'm sorry, Southern West Virginia, I think? West Virginia. I drive it from West Virginia to California. That takes, you know, a few days, a week, whatever. I'm going to drive it back. It'll take me about a week to drive it back while I'm in California and it's parked at my mother-in-law's driveway. Is this truck a mine? Judge Walker, I don't mean to disappoint you, but it's very factually intensive. I don't mean to, you know, I understand the court's interest in testing the boundaries of this using hypotheticals, but, you know, if the truck, after a robust factual analysis, is determined to be used in mining, then the statute would cover it. I think that's more of an answer than you told me you were going to give me, because I think your answer is it could be a mine. Yes. But, you know, if you would like to challenge MSHA's exercise of jurisdiction over it, the courts, you know, you could raise that challenge over these outlier fringe hypotheticals. And so just, if the truck has been used and will be used, you have no geographic limit? Yes. And then one last, I guess it's not really even a hypothetical, but presumably there was a mechanic who was working on the trucks in this case, either at the time of inspection or shortly before. Yes. Section G defines a miner as, miner means any individual working in a coal or other mine. And, of course, then Section H defines coal or other mine. So, in this case, the mechanic who worked on these trucks, was that mechanic a miner? Yes. Yes. And that analysis would also, you know, have to do with whether or not that person, you know, worked for KC Transport. You know, there might be other facts that sort of shed more light on that, but yes, under these facts, yes. I'm happy to, I'm sorry. I guess what I was trying to get at, probably not very artfully, I'm talking about the Congress creating a mandatory inspection regime. It's not like the secretary may inspect, but it's the secretary must inspect in the particular, you know, with a particular frequency. It seems to me that then, since coal or other mine is the definition that is pertinent to that inspection requirement, that coal or other mine has got to be construed to mean some sort of a land or a road or some sort of like stationary physical facility that is involved in extraction and related things. And then any other equipment that is on that land or at that facility that, you know, is used in conjunction with those kind of mining activities, those extraction type of activities. And so that way you give some meaning to Part C, and Part C means locations can be beyond what is in A and B, but it's still got to be some sort of a facility, a building, that sort of thing. And then the equipment that is, that services the activities that occur there. What's wrong with that interpretation? Thank you. I think I understand. You know, there are these static items in Subsection C, and it would be much easier for them to inspect, you know, a facility or a tailing pond that sort of lives in one place. And there's, you know, if these trucks are mobile and they travel, then that poses a challenge. But the statute says equipment used in mining. And insofar as those trucks alone are equipment used in mining, you know, MSHA would inspect them, though they travel around. So, okay. I mean, I don't want to belabor this. I mean, it can't be the case that, you know, a traditional mining company could evade inspection of its trucks by, like, secreting them away, you know, someplace, you know, a few miles away from the mine in a parking lot and say, well, there's no extraction or anything happening there. So that physical area is not a mine, and these trucks can't be considered mines, and you can't inspect our trucks, right? That would be kind of an absurd result for a mining company to be able to do that. But I think that that seems to be distinct from saying that kind of a truck. It would seem to, I guess I'm just trying to understand, help me understand how the secretary implements the mandatory inspection responsibility under your construction of the statute. So I think that the typical scenario is sort of one like this case. These trucks travel between the extraction sites and the preparation plant, and then they were located nearby. It would be sort of bad business practice to store your trucks extremely far away. That's typically how these scenarios play out. When a truck is used in mining, it is, the mine act covers it. The sort of, like, travel and geography might lend itself, you know, that would be considered in the analysis. But if the truck is used in mining, MSHA, you know, I understand your question is how will MSHA locate these trucks as they travel around? And I think typically MSHA will locate these trucks because they will be nearby. But nearby is not a requirement for the statute to reach those trucks. But more broadly, I think this raises the issue of there's a mandatory inspection provision. It's in 30 U.S.C. 813a, and it says you have to inspect twice a year. And if you define mine to be equipment, how do you know what all the equipment is so that you must inspect it twice a year? I think that's the question. Yes, I, typically in the mining industry, this equipment, these trucks, et cetera, MSHA has a sense of where they are. They're used in mining, and so there is a relationship between that equipment and those facilities, et cetera, in the mine, particularly those static facilities like tailing ponds. You know, MSHA has a sense of where things are. But the, so in order to inspect, MSHA will find those things. So is it your position that these trucks are equipment, they're mines, they would have been inspected? Typically they might have been inspected when they had hauled the coal to the physical site, and you would have known they were there and inspected them there. But in this particular occasion, you happened to see them in a place that was not physically located at or pertinent to a mine, and you're still allowed to inspect them? Is that kind of where we end up in this particular case? I think that's fair. MSHA did cite these trucks when they were on the extraction area, so MSHA had jurisdiction to cite them under A. They also traveled that road, so MSHA would have had jurisdiction to cite them on that road. And, you know, in this instance, they remain equipment used in mining, even as they travel away from that extraction area and that road. And so in this instance, you know, an inspector discovered them being worked on without being blocked against motion. And so, you know, the statute still reached them at that time. So I just want to make sure I understand the facts correctly. The trucks that are the subject of these two citations had been cited previously at a different location than where they were located, where they were cited here at this, the subject of this petition. Yes, that's correct. They have been cited while at the extraction site. So I guess one argument in your favor is it would be odd for them, the trucks, to be mines at one time and not mines at another time. Yes, and, you know, the hazards that are associated with those trucks don't disappear when they travel across an imaginary line. You may not know the answer to this, but I guess as a practical matter, does MSHA have some sort of regulatory process whereby it requires, you know, mining companies to kind of give it an inventory, so to speak, of all of their various facilities that might fall within the definition here? I apologize, but I don't know the answer to that. MSHA has many regulatory sort of record-keeping infrastructures, but I'm not sure about the answer to that question. All right. One last question. It wasn't clear to me. We talked about in the Donovan v. Stalite case the interagency agreement between OSHA and MSHA. I didn't see, I think the ALJ decision may have referenced the interagency agreement, but it doesn't seem to be any, like, discussion of it in the Commission's decision or I think even the Secretary's decision and not in the briefing. Is it not relevant or why is that? No, it is relevant sort of to whether or not MSHA will reasonably stay within the bounds of reasonable enforcement. The Memorandum of Understanding lays out sort of certain situations where MSHA or OSHA has jurisdiction over very specific things, and then it contains a provision that says that the agencies will work together and that they'll attempt to achieve convenience of administration and that they will contact one another when it's relevant. And, you know, I think the convenience of administration piece is quite relevant to this case. It makes sense for MSHA to inspect equipment used in mining. MSHA is the agency that's tasked with regulating the mining industry. And in terms of this particular case, it made sense for MSHA to inspect these trucks in this facility because MSHA was there. I hope that that sort of addresses the relevance of the Memorandum. But I don't, is the current iteration of that Memorandum of Understanding in the record here? No. I didn't think I saw it. No. Where would I find it if I wanted to find it? I believe it's published in the Federal Register. Any other questions? I have one, I think just one. If we rule for you in this case, we would have to create a circuit split with the Sixth Circuit on what your brief calls a simple question of statutory interpretation that has significant consequences nationwide. Is that right? No. I would say no. The Sixth Circuit is already split with this court. Maxim is out of step with National Cement and with Carolina State Light. Maxim requires that subsection C items be located on subsection A or B mines. And that's just not congruent with cases this court has already decided. So it's the Sixth Circuit that has already split from this court. So we would be reaffirming all that stuff I just said rather than creating it. Yes. Is that right? Yes. Thank you. So you said that we have already said that C extends beyond physical locations that are in A and B. When did we do that? Donovan v. Carolina State Light addresses a facility that is not located on subsection A extraction land, an area of land where minerals are extracted. In that case, this court said that the subsection C facility need not be located on that land. And then National Cement, in National Cement, this court recognized that subsection C was an independent basis for jurisdiction and that vehicles, equipment, need not be located on a subsection A area of land. You know, I recognize that in National Cement these trucks were on a subsection B road, but this court did not hold that they were required to be on a subsection B road in order for subsection C to attach. So, okay. I hear your argument. I think that in Donovan, I guess we didn't say that that particular facility was in a location that fell within subsection B. We did point out that the facility was basically directly adjacent to the extraction area, but I guess I take your point that that wouldn't make it within subsection B because B says private ways and roads, and we didn't rely on subsection B to find that to be a facility. We relied on subsection C. Yes, and I would also say that this court didn't rely on the fact that it was adjacent. It happened to be adjacent, but that didn't bear on the application of subsection C to that facility. Thank you. All right. Thank you very much. Please support James McHugh on behalf of KC Transport. Before I launch into my argument, I did want to clarify two points. One is that the trucks that were cited in this case were not the ones that had previously been cited by the inspector. He was going up to find two different trucks, and then he cited these trucks. I just wanted to clear that up. And then as far as the memorandum of understanding, it's my understanding that it came down as a result of, like, the last sentence in section 3H that talks about milling, and because milling facilities sometimes are crossed between a milling facility under 3H and an actual manufacturing facility, the Congress said, well, you know, you need to get together and work this one out because it's right on the edge of a manufacturing and a milling facility. Let me ask a fact question. This is probably not going to decide the outcome of the case, but I don't know a lot about coal mining. The statute talks about extraction, milling, and preparation. I get what extraction is. What's the difference between milling and preparation? There's definitions for those different things. Preparation plant is how they get the coal ready to ship it out, Your Honor, and the cases talk about how the extent of the preparation plant. Preparation plants are regulated. In fact, this Elk Creek plant was a preparation plant, not an extraction plant, but it wasn't a milling plant. So there's some distinctions in the definitions on what a milling plant is, Your Honor. So the stipulated facts say that the sited trucks are inspected regularly by MSHA when they are at the five Ramico Resources mines and at the Elk Creek prep plant along the Hall Road. So these trucks are inspected regularly. They just happened in this particular occasion to be in a parking lot. Your Honor, yes, the trucks are inspected regularly in the sense that when they're on the mine site, for example, when they're at the prep plant, when they're at the extraction sites, and when they're on the roads, they are inspected regularly. So your position is that they're a mine when they're at the extraction site, but they're not a mine when they're in the parking lot? Yes, Your Honor. When they're at the extraction site, the milling site, or the extraction site, the preparation site, and on the road, we agree they can be inspected because at that point the contractor becomes an operator when he's performing services at the mine, and these trucks can be inspected, Your Honor. So KC Transport's position is you have an independent maintenance facility, KC Transport. They have five of these. They're spread out. Some of them are in the middle of town that service trucks. This one happens to be where it is, which the facts talk about. Our KC Transport point is if the Secretary's analysis of Section 3H is approved, then there really is no stopping point, and I think the Court's already talked about some of the situations that could come up, like equipment manufacturers refurbishing, equipment refurbishing, tire repair, for example, radio repair, sawmills that cut timbers to go in the mine. Because this is an equipment that is to be used in a mine, a timber, while it's sitting at the sawmill, it would be subject to MSHA regulation under the Secretary's limitless approach. Warehouses with fork trucks would be subject to the Secretary's approach, and I'm sure that the Court and the Commission has talked about some of these other things, and that's why it's so important in KC Transport's position to look at Section 3H-1 as an overall whole regulation under Chevron. In other words, not to isolate Subdivision C and say, well, Subdivision C says equipment used or to be used or resulting from mining. That's an overly broad reading. You're taking one section out of context. Just so that I'm clear about your argument, the legal structure of your argument, you are not contending that Subsection C is unambiguous. That's correct, Your Honor. You concede that it's ambiguous. Oh, no, no, I think it's unambiguous. You think that it's unambiguous. Yes, Your Honor. So we should find that it's unambiguous at least with respect to this application or it's unambiguous in general? I think it's unambiguous in general, Your Honor, and the reason I think that is because even this Court in the Cal Portland case says that if you read it and you have some thoughts or some second guesses on first reading, you still have to consult all of the tools of statutory construction such as text, structure, history, and purpose. And what Maxim did and what the Commission did here is they looked at C and they said, okay, lands and equipment, but when we look at this, it's in relation to extraction areas, roads, preparation areas, milling areas. So, in other words, you can't just look at C in isolation and say, okay, if an equipment's used in or to be used in or resulting from mining, that it's automatically a mine, because that's not the way Congress intended. Surely Congress did not intend to regulate the coal truck, for example, that drives to California and says that when this person who's driving it arrives at their parent's house for dinner, they've got to, you know, chalk it. Now, should they do that? Yes. How do you explain our decision in Donovan v. Stalite? In Donovan v. Stalite, Your Honor. You relied on subsection C there, right? Or the Secretary did and we upheld that as reasonable, right? In subsection C in the Donovan v. Stalite case, that's a preparation plant. In other words, the mining materials, the gravel or an aggregate, was going directly into this gravel processing facility. So that becomes a processing plant under subsection C. So our position is that when an equipment is being used at an extraction site, a processing site, or on the road, it can be inspected. There's jurisdiction for that. And that goes to the question of what the court, you brought up, Your Honor, that how do you know what equipment's at issue? But that's not what the Sixth Circuit said, and that's not what the commission said. The commission said that, and I'm looking at JA-164, the commission said, you know, after construing this statute, that subsection C does not have a further geographical extension of jurisdiction beyond A and B. And I don't see how that's consistent with our decision in Donovan, and I don't see how that's a correct interpretation of the statute. And it's not what you're saying to me right now. Well, I mean, what I'm basing mine on is the fact that the Elk Creek PrEP plant is part of the extraction, it is part of the extraction operations, just as the stay-alike case was. In that case, it was even more clear because the conveyors went right into this facility. So it was, like, right there. It was adjacent and pertinent to it. So it falls under the commission's rule there. I don't think, you know, the commission didn't. The commission didn't. The secretary didn't rely on B there, and this was upheld under C. Yeah, I meant it was next to A. Yeah, but it didn't fall within A technically, and it didn't fall within B, right? You would agree that it didn't fall within A or B and it fell within C in Donovan? I think the stay-alike, my recollection of it, and I'd have to look at it again, but as I understand it, it was a PrEP plant that was adjacent to the extraction facility, and the extraction facility dumped its gravel right into the PrEP plant. I mean, that's my thumbnail recollection of it. So our point is that the commission is correct that C is not just a read-alone thing without a locational reference, that the lands and the equipment must have a locational reference to the areas that are a mine. Another thing that the commission said was that the coal act, the definition of coal mine in the coal act, this is at J161, they said they listed the definition of a mine from the coal act, and then they said the mine act that came eight years later was only intending to clarify the definition, and it wasn't intended to expand the definition. And I'm not sure how that can be right because the mine act retained the definition of mine from the coal act, but they put it in H2. So that's in 802 H2, it said that it includes a definition for coal mine that applies to certain subchapters, subchapters 2, 3, and 4, and when I look at the definition of coal mine and looked at the definition of mine from the coal act, it seems to be verbatim the same. Do you agree with that? Your Honor, to start where you started with the commission saying that they were attempting to clarify the coal act, I think in context what their comment was, the clarification was, in addition to just the straight extraction area, you've got these other things that are listed in C, and these are intended to be those things that are around a mine otherwise. And I think that's the point that the commission was trying to make, and I think it's well-founded. It's the same point that the Maxim Regal Court made. As far as the specific language of the coal act, I can't answer your question on that, Your Honor, because I haven't looked at that the way Your Honor did. Do you think Donovan would have come out the same way as it did in our court if Donovan had applied the Sixth Circuit test? And I think the Sixth Circuit test says it will be covered by H1C if it's adjacent to an extraction site. I think, Your Honor, it probably would have come out similar because it's not only adjacent, it was integrated. It was an integrated extraction slash preparation facility. So I think even the Sixth Circuit would probably agree on the Donovan versus Stalite case. I don't think the Sixth Circuit's situation deals more with these independent, non-mining-related companies that are doing things other than mining, other than extraction, other than milling, and other than preparation. Those, you know, saw mills, you know, tower repair companies, radio repair companies, and independent facilities that repair trucks, whether it's Casey Transport's repair facility or the repair facility down at the corner where the coal truck leaves the mine site and goes there to get a tire replaced. I think that was the difference between those two. So I think our reading of the regulation or statute is entirely consistent with what the court normally does under Chevron, which is they look at the statute, and then they look at the tools of regulatory construction to see how that section relates to everything above and below it, including not just in Section H, but also Section D that the Commission looked at as far as when is a contractor an operator, when they're at the mine performing services. Under the Secretary's reading, they'd be an operator all the time, even off the mine site. So there would be no need for Section D to say, while they're at the mine site, while they're not. I think that was the Commission's point on looking at D. Let's suppose you had a coal mining company, and they have a hundred different sorts of trucks and other vehicles that are used for the coal mining, and the inspector shows up and says, I want to inspect all of your trucks, and some of the trucks are there physically at the mine, and some of them are at basically a storage parking facility that's ten miles away. Can the inspector say, well, I want to inspect all the trucks, I want to inspect the ones that are here, and I want to go to this other parking lot and inspect the ones that are there, or can the inspector only inspect the trucks that are at the physical mine? And you're talking about a trucking facility, Your Honor? Correct. If it's a trucking facility, our position is they can inspect the trucks at the mine while they're engaged in mining services, because at that point, the Commission has stated, or the Congress has stated they're part of the mine. But when they're at the trucking facility undergoing repairs, there's no locational nexus between the trucking company. So I'm just trying to make the hypothetical as simple as possible. So they're not, these are trucks that aren't owned and operated by like some independent contractor like your client. You know, the ABC Coal Mining Company owns these trucks, but at the time that the inspector shows up at the actual physical mine, he's like, I know you all have some other trucks that aren't here. I want to see those and inspect those. And they're like, well, those are at our lot, which is ten miles away, but we're not going to let you inspect those because they're not here at the mine. Would that be a correct way for this statute to work? I don't think so, Your Honor, because I think that the equipment, because equipment is so fungible, that they have to be at the mine site. That's the only realistic way to do it. Even in this case, the floor. I want to make sure I understand because maybe I didn't, I've got too many negatives or something in my question. Can the inspector go to the parking lot ten miles away where ABC Coal Mining Company stores its trucks and inspect, yes or no? No, Your Honor, because that's no different than ABC Coal Company has bought three continuous miners from this manufacturing company. And they're sitting on the dock at the manufacturing company. And the inspector would say, I want to see those continuous miners. I know they haven't been delivered yet, but they're to be used in coal mining. I want to go inspect those. And that's not what Congress intended here. Congress intended for the inspector to inspect what's at the mine. So that would be my response to that, Your Honor. I understand. I know you're trying to make a close call. Could OSHA or the inspectors for OSHA inspect the trucks in Judge Wilkins' hypothetical? OSHA would certainly do it, absolutely. And so what's kind of, what's the pragmatic reason for wanting OSHA to do it when, you know, the mine inspector, he's inspecting the other 99 out of 100 trucks, and this one truck is 10 miles away. You know, he's in the area already. It seems maybe more efficient to just, I don't know, let him do all 100. Well, the pragmatic aspect is basically what this Court recognized in national cement when the Secretary first came with a very broad definition of their jurisdiction. And the Court said, no, you can't have a vague definition that's based on prosecutorial discretion. That doesn't work. That's not doable. Go back and actually come up with something that's reasonable. I get it. But I guess why do you care whether it's a mine inspector or an OSHA inspector? Your Honor, I care because Congress cared. And Congress set out the statute and put these in mining and these in OSHA. And like some of my examples I gave, for example, the timbers that are going to the mine, you know, MSHA doesn't regulate any kind of logging or sawmills or anything like that. So if you take it to this no-stopping point degree, you step on OSHA regulations. These mechanics are customarily used to OSHA regulations because the other five KC transport facilities are inspected by OSHA, and that's where they work and maybe they transfer over here and maybe that's what they're trained for. So then when they just happen to be at this facility, they have to undergo different regulations, different training, and it's just very confusing. Whereas the statute is a very bright line rule. If you're at the mine, jurisdiction attaches. And I think that's what the maximum court was trying to bring out. I think that's what the commission was trying to bring out. Well, Congress wanted to protect miners and promote mine safety, and under your reading of the statute, a mining company can avoid inspection by just moving equipment off the site. Well, I understand your point, Your Honor. I don't think that's – I mean, I don't think that would be the intention, but, you know, the thing is, is if you go overly broad like the secretary has, there's just no limits. No one has any predictability. You know when you look at A, B, and C that when the trucks are at these sites, extraction, milling, preparation, and roads, that they're subject to inspection. And that best protects the miners. The secretary says they don't have the resources to go out and inspect all these other places. Well, I mean, the best way to protect the miners is to use the resources for what Congress intended, not what Congress did not intend. That's what OSHA is for. But if Congress intended for subsection C to be limited in the way that you say, why didn't they just say that? They didn't say that. Well, Your Honor, I mean, I understand your point, and there's been people – we've argued a lot about this. It seems that if you look at it in relation of the Coal Act to the Mining Act, and then A, B, and C like it is, and apply it the way Maxim did where you look at the lands and the equipment, and then you kind of look back and say, well, where are these lands and the equipment? Well, they're at the extraction site, the milling site, the preparation site, and on the road. Then at that point, I think they did say it. I think it is clear at that point. Like I said, in the Cal Portland, this court said it may not always be easy to read the first time, but when you pull the lens back and you look at the three sections together, then you can understand what they're saying. And then when you throw in on top of it, the commission said under Section 3D that contractors become operators when they're at the mine site. If it's as broad as the Secretary, if it's interpreted that way, then that section of the statute would have no effect because contractors with these type of equipment would always be operators. And that can't be what Congress intended, otherwise they wouldn't have added that other section. All right. We'll give you, we've kept you up a long time. Mr. McHugh, if you have any final arguments that you didn't get a chance to make, why don't you take a minute or so to make those. Thank you, Your Honor. The last thing I would say is MSHA asserts in their brief that it's always been this way, that this is no surprise. But even in this case, just a few years ago, there's some internal inconsistencies where there was a citation of a shipping trailer that's in the brief that was vacated. It was down next to the haul road. But the Secretary chose to vacate that when Casey Transport raised a jurisdictional argument. And then, in this case, the Secretary's first position was, we want the trucks. We want a certain jurisdiction over the trucks. When that was determined by the ALJ and the Commission to be, you know, not appropriate, then they said, well, we want the trucks and the facilities. So, and then now, before this Court, they say, we want the trucks and the facilities, but only to the extent our resources allow. So, what I'm, my point is, is the Secretary's position has never been consistent on this. You know, yes, we can look at some older cases and we can say, well, this is the way it was in that older case, like the Jim Walter. But the Court said, maybe the arguments weren't made like they are here. Maybe, who knows. But the Commission said, no, that's not persuasive to us. We're not going to follow that. But my point is, is because the Secretary has never been consistent on this, there's no, the Court should never give him deference on this, because part of the requirement to get deference is you have to be consistent. You have to treat this trucking company like this tire company, or this trucking company like this sawmill manufacturer that's making timbers. That's the problem. If you go down, if you get too broad, then you get inconsistent. And I think that's what this Court tried to point out in the National Summit. Thank you. Thank you. All right. Ms. Maltz, you are out of time, but we'll give you three minutes for a vote. Thank you. So I'll just, to address a few things that my colleague mentioned. The Secretary's position is that the statute is unambiguous. The Secretary is not asking this Court for deference. The Secretary is simply asking that this Court read the plain meaning of the statute, you know, as the Secretary does. You know, I'd like to address this sort of reasonable enforcement issue. Casey Transport suggests that there will be this sort of parade of horribles, and she'll go to Judge Walker's mother's house and cite trucks. There's been no evidence in the record that MSHA's ever done anything like that. There's been no evidence that MSHA's cited trucks in diner parking lots. This, you know, the statute is not limitless. There is a limiting principle in the statute. It's whether something's used and mined. And MSHA does not, you know, go out to the fringes to terrorize diner parking lots. That's just not what's occurred. You know, I think we have discussed the plain meaning of the statute, and it's been thoroughly briefed, but I'll just say that the Secretary disagrees with Casey Transport's reading of the statute. Subsection C does not contain a locational requirement, and Congress did that deliberately. And Congress was clear that what is to be considered a mine under this Act should be given the broadest possible interpretation, and, you know, close cases should be resolved in favor of mine act coverage. I would also like to address sort of this question about whether or not Maxim applies, you know, the facts that Maxim might bear on this court's decision in Carolinas Daylight. While that facility was adjacent to the extraction site, those weren't the grounds on which the court decided that subsection C applied. Maxim is a radical redefinition of the statute. Maxim requires a locational requirement that Congress did not, you know, Congress didn't put into the statute. Maxim puts that into the statute on its own. On that point, and maybe this is not fair to ask you, as opposed to you and all the people who would have gone into this decision, but if Maxim was a radical redefinition of the statute, and it was going to have, as your brief says, profound importance to the safety of miners, it seems odd that you didn't seek cert, or did you? I don't think you sought cert, but if I'm wrong about that, do I need to correct me? No, the Secretary did not seek cert. Doesn't it seem odd? It may be odd, yes. I do think that it is fair that you find that odd. Okay. Thanks for your candor. Thank you. Have any other circuits adopted Maxim, or have any other circuits adopted what we said in National Cemetery? No other circuits have adopted Maxim. I think that the Fourth Circuit has Harmon in the Fourth Circuit. I apologize, but I don't have the facts of Harmon at hand. But other circuits have considered Amherst jurisdiction, and only the Sixth has required this locational element. I'd also like to address, just very briefly, Section 3D and the Commission's sudden announcement in its decision that independent contractors are only citable as operators under the Act if they are physically present at the mine. The Commission did not have jurisdiction to raise that issue. That issue appeared for the first time in the Commission's decision. There are two avenues for the Commission to exercise. There are two avenues for the Commission to reach an issue. It can be raised by the parties, or the Commission can direct review of that issue on its own. But directing review of that issue on its own requires the Commission to hold a vote. Oh, I apologize. I see I'm over time. I'll just very quickly conclude. It requires the Commission to hold a vote, and it requires the Commission to issue an order announcing the issue that it plans to reach. And the Commission didn't do that here. The Commission did not have jurisdiction to reach the Section 3D question. I have a question. So I mentioned before that the legislative history that was cited by the parties, the Senate report talked about how this new definition of coal or other mine was incorporating a definition from the Federal Metal and Nonmetallic Mine Safety Act. And I just pulled that act up in the definition of mine from that act. And in the Subsection 3 definition from that definition of mine does appear to be verbatim taken into the new statute that we have here, the Mine Act from 1977, except that it left out some language with respect to radioactive materials. And I don't know if it mentions that in the Senate report that was cited, but there was a House conference report that I don't think that the parties cited for the Mine Act of 77, but it talked about the fact that this radioactive materials wasn't going to be included in the definition of mine for the Mine Act of 77. All this is a long way of saying that wouldn't it be relevant to see how, if at all, courts and or the Secretary interpreted this identical language from this prior act to see what the construction should be when it has been kind of engrafted into the Mine Act? Yes, it could be relevant. I apologize for not being familiar with the language of that act, but I think what's more relevant here is how, you know, is the plain meaning of the statute of the Mine Act and how this court has applied that plain meaning, you know. I mean, I don't know that it's the case, but what if a court had construed this prior act and said that we think that the plain meaning is X? I mean, that would be something that we wouldn't want to know, right? That would be very relevant, yes. Any other questions? No. All right. Thank you. We'll take the matter under advisement. Thank you very much.
judges: Wilkins, Walker, Pan